IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| AFFILIATED HEALTH CARE ASSOCIATES, P.C. On behalf of plaintiff and a class, <br><br> Plaintiff <br><br> v. <br><br> HANDIT2 NETWORK, LLC, STANDARD HOMEOPATHIC CO., HYLAND'S, INC. and JOHN DOES 1-10, <br><br> Defendants. | 13-cv-5782 <br><br> Hon. Manish S. Shah <br> Magistrate Judge Finnegan |

### DECLARATION OF DANIEL M. KROMBACH

I, Daniel M. Krombach, declare and state as follows:

1. I am the President and Chief Financial Officer of Standard Homeopathic Company ("Standard"). I am over the age of 18 and am fully competent to make this declaration. All of the statements in this declaration are based on my own personal knowledge or upon records kept in the ordinary course of business of Standard. If called as a witness, I could and would testify to the facts stated in this declaration.

2. Standard is a privately-held corporation that manufactures and sells homeopathic medicines. Hyland's, Inc. ("Hyland's) is one of Standard's wholly-owned subsidiaries and is the primary operating entity through which Standard markets and sells its products. I will refer to Standard, Hyland's and Standard's other wholly-owned subsidiaries collectively as the "Company.[1]"

---

[1] As reflected in the attached consolidated financial statements, Standard's wholly-owned subsidiaries are Hyland's, Hyland's Homeopathic Canada, Walker Laboratories, Inc., SHC Investments, LLC, and 13301 South Main Street, LLC. The Company's consolidated financial statements eliminate all intercompany balances and transactions between and among Standard and these subsidiaries.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3. The last five years have been an extremely difficult time for the Company. The difficulties started with a major product recall in 2010, and were then compounded by an onslaught of class action litigation. The litigation falls into two categories: (1) multiple class action lawsuits currently pending in California alleging that the Company misrepresented and falsely advertised the effectiveness of its products, and (2) two class action lawsuits alleging violations of the Telephone Consumer Protection Act ("TCPA"). The TCPA lawsuits are the case pending before this Court, Affiliated Health Care Associates P.C. v. Handit2 Network, LLC, et al., Case No. 1:13-cv-05782 (N.D. Ill.), and a similar case pending before the United States District Court for the Central District of California, Edward Simon, D.C. v. Hyland's, Inc., Case No. CV 2:13-7892 (C.D. Cal.). As a result of the product recall and all of the class action litigation, the Company's cash flow and its ability to fund its ongoing operations have been seriously compromised.

4. The recall occurred in October of 2010. In cooperation with the FDA, the Company voluntarily recalled all packages of Hyland's Teething Tablets, an over-the-counter homeopathic medicine for the temporary relief of symptoms of restlessness and irritability in young children due to cutting teeth. As a result of the recall, the Teething Tablets – the Company's most popular product at the time – were off the market for nine months before being reintroduced with a new formula in July of 2011. The costs to the Company were staggering. The direct costs for retaining a recall coordinator, providing refunds to trade customers and consumers for the return of the product, processing charges and fees from trade customers, and destruction of all on-hand merchandise totaled just under $3.5 million. (*See* Notes to FY10-11 Consol. Fin. Stmts. at p. 19, ¶ 13, attached to this Declaration as Exhibit A.) Beyond that, the Company suffered an estimated $7 million in lost sales during the nine months when the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Teething Tablets were off the market. Thus, the financial damage resulting from the recall totaled more than $10 million.

5.     The first of the California class actions was filed in September of 2011, shortly before the conclusion of the recall process. Additional class actions were filed throughout 2011 and 2012 in California state and federal courts, all alleging that the Company misrepresented and falsely advertised the effectiveness of its homeopathic products[2]. The essence of the claims in these cases is that the Company's advertising of its products is false because homeopathic products do not work. In other words, these class actions challenge the fundamental premise of homeopathic medicine, and therefore threaten the ongoing viability of the Company's entire business. If the plaintiffs were to prevail in these cases, the Company would be exposed not only to substantial awards for damages and plaintiffs' attorneys fees, but also to a need to fundamentally change the products it sells. Therefore, the stakes are enormous, and the Company has incurred and continues to incur major costs to defend these cases. The Company has incurred defense costs totaling more than $4 million so far, and is continuing to incur defense costs at a rate of approximately $100,000 per month. The Company has no insurance coverage for these defense costs or for any damages that might be awarded if the plaintiffs were to prevail.

6.     The California class actions are <u>Acuna v. Hyland's, Inc., et al.</u>, Case No. CIVDA1110816 (Cal. Sup. Ct.); <u>Allen v. Hyland's, Inc. et al.</u>, Case No. 2:12-cv-01150-DMG (MANx) (C.D. Cal.); <u>Forcellati v. Hyland's, Inc., et al.</u> Case No. 2:12-cv-01983-GHK (MRWx) (C.D. Cal.); <u>Roemmich v. Hyland's, Inc., et al.</u>, Case No. CV-12-6256-JAK (JWx) (C.D. Cal.); <u>Sandoval v. Hyland's, Inc., et al.</u>, Case No. CIVDS1201442 (Cal. Sup. Ct.), and <u>Zabala v.</u>

---

[2] Another purported class action was also filed against the Company in New Jersey, captioned <u>Hoffman v. Hyland's, Inc. et al.</u>, Case No. BER-L-4439-13 (Sup. Ct. N.J.), but was voluntarily dismissed.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Luyties Pharmacal Co.[3], Case No. CIVDS-12-01443 (Cal. Sup. Ct.)[4]. The Acuna and Sandoval cases were consolidated and a class of California purchasers was certified by the court on March 7, 2013. However, after the Court subsequently denied the parties' cross-motions for summary judgment on July 7, 2014, and made negative indications regarding the effectiveness of the plaintiffs' expert testimony in another case, the plaintiffs developed doubts as to whether they could overcome the Company's expert testimony to prove their claims on a class-wide basis. The attorneys representing the plaintiffs in the Acuna and Sandoval cases proposed a settlement in which the class would be decertified based on the plaintiffs' stipulation that they are unable to prove the class-wide claims they had alleged, in exchange for a modest payment by the Company and for the Company revising the its product labeling to state that the statements made are based on traditional homeopathic practice and have not been reviewed by the Food and Drug Administration. The Company agreed to settle on that basis, because it eliminated the risk of a class-wide recovery and the cost was less than that of continued litigation.

7. The Roemmich case was consolidated with Forcellati, and the courts in both the Forcellati and the Allen cases have since granted certification of nationwide classes of purchasers of various of the Company's products pursuant to Rule 23(b)(3). The Company petitioned to appeal the certification in the Forcellati case but the Ninth Circuit denied our petition. Trial in the Allen case is scheduled for June 2, 2015, and we expect the trial in the Forcellati case to be scheduled for later in 2015 as well. We do not believe that a settlement is likely in either case.

---

[3] Luyties Pharmacal Company is a brand belonging to one of the Company's subsidiaries.
[4] Another class action captioned Kahn v. Hyland's, Inc., et al., Case No. BC488381 (Cal. Sup. Ct.) was also filed in California state court alleging claims on behalf of a California class of consumers but the same claims were already being litigated on behalf of a nationwide class in Allen. The Khan case has been dismissed.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8.     In 2013, the Company's litigation burden increased even further with the filing of the two TCPA class actions. And, in addition to those two class actions, the Company was also named as a defendant in a coverage lawsuit filed by the insurer for co-defendant Handit2 Network, LLC. That case is <u>Nationwide Mut. Ins. Co., et al. v. Handit2 Network, LLC, et al.</u>, Case No. 1:13-cv-07278 (N.D. Ill.). To date, the Company has incurred more than $900,000 in attorney's fees and costs on the defense of these three lawsuits, which has only compounded the Company's financial issues.

9.     The Company sought insurance coverage for the TCPA class actions, but all of its insurance carriers denied coverage. Most of the insurance policies contain provisions expressly excluding coverage for TCPA claims. Because those exclusions made it unlikely that the Company would succeed in contesting the denials of coverage, and because the Company cannot afford even more litigation expense, the Company determined that pursuing litigation to contest the denials of coverage was not a viable option. Instead, the Company entered into settlement agreements with its insurance carriers under which the carriers agreed to make modest "cost of defense" payments to the Company in exchange for the Company dropping its claims for coverage. The total amount of these settlements is $47,500.

10.     The Company also experienced a sales shortfall in its fiscal year 2014, which ended June 30, 2014. Based on sales in the prior fiscal year, the Company anticipated and planned for 15% sales growth in fiscal year 2014. That did not occur, in large part because the cold, flu and cough season was significantly lighter and shorter than the prior year. This forced the Company to more aggressively promote and discount its products, which depleted its cash resources by an additional $900,000. In addition, by April 2014 the Company had to abandon the seven-day continuous operations model it had just recently implemented in November 2013. The

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

seven-day model was intended to support the anticipated increase in sales and the required investments in manufacturing support, regulatory compliance and quality infrastructure had already been made. The sales shortfall forced the Company to revert back to its previous five-day operating model after just five months, but the costs already incurred for the conversion were not recoverable. The combination of the sales shortfall and these incurred costs had a significant negative impact on the Company's cash position and profitability.

11. The cumulative result of the product recall, all of the class action litigation and the 2014 sales shortfall is that the Company's financial results for the fiscal year ended June 30, 2014 put the Company in default of its financial covenants with its lender, Bank of America. As a result, the Company has been forced to re-negotiate its credit terms and covenants with Bank of America in order to avoid a default, which delayed the finalization of the Company's audited financial statements for the year ended June 30, 2014. As part of this re-negotiation, the Company had to seek an additional $1 million of line-of-credit borrowing capacity, because it had almost completely exhausted its existing line-of-credit and needed to borrow more money to fund ongoing operations. The Company just recently completed all of these re-negotiations, and the fiscal year 2014 financial statements were just finalized. Copies of the final audited financial statements for the fiscal year ended June 30, 2014 are attached to this declaration as Exhibit B.

12. As shown in the fiscal year 2014 financial statements, the Company had only $1,010,556 in cash at year-end. (*See* FY13-14 Consol. Fin. Stmts. at p. 7.) That amount covers the Company's operating expenses for only approximately one week. For the full year, the Company had negative cash flow of $3,482,575, which means the Company spent approximately $3.5 million more cash in operating and investing activities than it took in. (*See id.*) To fund this cash drain, the Company was forced to borrow $3,451,809 in order to keep the business running.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

(*Id.*) The Company ultimately booked net income of $546,255 for fiscal year 2014, but only after accruing a favorable tax benefit in the amount of $603,195. Without that tax benefit the Company would have ended the year with a net loss. (*Id.* at p. 5.)

13. The negative cash flow has forced the Company to borrow on its line-of-credit to continue operations. The Company's June 2011 line-of-credit agreement allowed short-term borrowing up to an aggregate of $5 million. (*See* FY12-13 Consol. Fin. Stmts. at p. 15, ¶ 6, attached hereto as <u>Exhibit C</u>.) The Company has been forced to increase that amount, first to $6.5 million, and then again to $7 million in August 2013. (*Id.* at ¶¶ 6, 13.) In the most recent re-negotiation of its credit terms, the Company increased its line-of-credit once again to $8 million. (FY13-14 Consol. Fin. Stmts. at pp. 14-15, ¶ 6.)

14. In addition to its short-term borrowing to fund continuing operations, the Company also has long-term debt totaling roughly $12 million (*See id.* at pp. 14-16, ¶¶ 6-7.), and is in the process of incurring additional long-term collateralized debt to finance the completion of a new manufacturing facility. To secure all of the long-term and short-term debt, the vast majority of the Company's tangible assets – including the Company's real property and facilities, equipment, inventory, and accounts receivable – are pledged as collateral, with the result that the Company is heavily leveraged[5]. The only assets not pledged as security are the Company's intangible assets like goodwill and deferred taxes. This means it is simply not possible for the Company to obtain additional funds that it could dedicate to settlement of this case by borrowing.

---

[5] The Company's combined total current assets ($27,645,946) and net property, plant and equipment assets ($17,157,016) as of June 30, 2014, were $44,802,962. (*See* FY13-14 Consol. Fin. Stmts. at p. 3.) Over 70% of those assets would be required to cover the Company's Current Liabilities ($18,343,615), Long-Term Debt ($11,812,501), and Other Liabilities ($2,387,332). (*Id.* at p. 4.)

7

15. To address the cash flow shortfall, the Company has not only increased its borrowing but also made significant cutbacks affecting management and staff at every level. For example, members of the Company's executive committee agreed in June of 2011 to receive Equity Rights Grants in lieu of hundreds of thousands of dollars they otherwise would have been entitled to receive in cash as compensation. (*See* FY10-11 Consol. Fin. Stmts. at p. 18, ¶ 11.) Although the Equity Rights Grants are technically payable upon the occurrence of certain triggering events, those events are considered improbable. (*See id.*) Thus, this was essentially a give-back by the executive committee members, out of their own pockets, to help the Company maintain operations. The executive committee members have also agreed to defer portions of their compensation throughout the year[6] in order to allow the Company to meet cash shortfalls and keep the business running. Holiday bonuses paid to employees have been reduced from $300 to $200 for the past two years. Even the annual holiday party has been scaled back.

16. The Company has had to go to extraordinary lengths to fund the payments required by the settlement agreement in this case. To make the first payment of $578,000 in August 2014, the Company took out a loan against the cash value of life insurance policies on one of its executives and one of its board members.[7] The Company will again borrow against those insurance policies in order to make the second and final payment required by the settlement agreement ($822,000 within ten days of final approval), which will fully deplete the cash value built up in those policies over the past 11 years. (*See* <u>Exhibit B</u> at p. 13, ¶ 5, showing insurance policy line item with a cash value of $1,421,470 in FY14.) The Company is borrowing against these life insurance policies to fund the settlement payments because there is no other way to come up with the cash for the payments without jeopardizing ongoing operations.

---

[6] These deferrals range anywhere from one to ten months.

[7] The Company records an asset equal to the cash surrender value of the policies, limited to the amount of premiums funded by the Company. (*See* FY13-14 Consol. Fin. Stmts. at p. 14, ¶ 5.)

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17. One indicator of the Company's cash shortage is its payment of accounts payable. The Company's accounts payable are generally due within 30 days. Before the recall, the Company was able to pay its payables early and take advantage of trade discounts for doing so. But now, the Company is generally late in making payments. It currently takes the Company 45-50 days on average to pay its payables. The result is that the Company's relationships with many of its trade vendors have become tenuous and many of them now will not ship new product until outstanding invoices have been paid.

18. Mr. Simon's objection to the settlement of this case states that he believes the Company could afford to pay $7-10 million to settle this case. As the Company's Chief Financial Officer, I am intimately familiar with all of the Company's finances, and I know there is absolutely no way the Company could do that and remain viable. The only way the Company has been able to come up with the $1.4 million it has agreed to pay is by borrowing against life insurance policies. There is no other way to come up with that amount, and no way to come up with more than that amount. The Company is using all of its available cash and short-term borrowing capacity to pay litigation expenses and maintain ongoing operations. Simply stated, the Company's ability to pay is totally maxed out.

I declare under penalty of perjury that the foregoing is true and correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Executed on January 9, 2015		DANIEL M. KROMBACH

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER